UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Cr. No. 20-10125-MLW |
| | ) |
| KEVIN BRILL, | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER

WOLF, D.J.                                                September 13, 2021

This Memorandum is based upon the transcript of the decision rendered orally on May 7, 2021, to which additional background and citations have been added.

***

Defendant Kevin Brill was an attorney operating as a sole practitioner in West Newton, Massachusetts. He served as co-trustee for two trusts ("Trusts One and Two") and maintained these trusts and trust-related bank accounts in the names of two other persons.

From October 2012 through July 2017, Brill engaged in a scheme to embezzle funds from Trusts One and Two. He created and utilized an undisclosed bank account in the name of Trust One as a pass-through to divert funds from Trust One to his law firm. He then used these funds for his personal benefit, including to pay off creditors. In total, he embezzled approximately $589,896.34. Brill subsequently failed to report $360,135.11 of these funds as

income on his tax returns and failed to pay $169,847 in taxes he owed to the Internal Revenue Service.

On January 11, 2021, Brill pled guilty to six counts of wire fraud in violation of 18 U.S.C. §1343, and four counts of filing a false tax return in violation of 26 U.S.C. §7206. See Dkt. No. 17. He was sentenced on May 7, 2021 to serve 24 months in custody followed by 36 months of supervised release.

At the sentencing hearing, defendant objected to the loss amount calculated by Probation in the Presentence Report. Defendant argued that the $589,896.34 loss figure overstated the loss because it failed to take into account the $378,080.53 he repaid to the trusts after he became aware that his embezzlement was about to be discovered, but before any federal investigation into his conduct began. Brill acknowledged that the Commentary to Guideline U.S.S.G. §2B1.1 provides that a defendant should be credited for funds repaid to a victim before the earlier of "the time the offense was discovered by a victim or government agency" or "the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." U.S.S.G. §2B1.1, Application Note 3(E)(i). See Defendant's Sentencing Memorandum (Dkt. No. 30) at 8. However, he contended that Application Note 3(E)(i) should not be applied to this case. See id.

2

Defendant argued that in Kisor v. Wilkie, 139 S. Ct. 2400 (2019) the Supreme Court altered the framework for how this court should interpret and apply the Sentencing Guidelines. See Defendant's Sentencing Memorandum (Dkt. No. 30) at 8. There, the Supreme Court qualified its earlier holding in Stinson v. United States, 508 U.S. 36 (1993), that the Commentary to the Guidelines is authoritative unless "it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson, 508 U.S. at 58. Pursuant to Kisor, the court may refer to the Commentary Application Notes only if a term - in this case "loss" - is ambiguous. See Kisor, 139 S. Ct. at 2413. Defendant claimed that, post-Kisor, the Sixth Circuit has concluded that Guideline §2B1.1, which governs the loss calculation, is not ambiguous and, therefore, the Application Notes are not authoritative for determining the total amount of loss. See id. at 12 (citing United States v. Riccardi, 989 F.3d 476, 486 (6th Cir. 2021)). Instead, defendant argued that the court should apply a more colloquial meaning of the term loss and conclude that the victims had only lost about $212,000, not $589,896.34. See id.

The court stated that it was not necessary to resolve defendant's objection because it would not affect the sentence the court imposed. See Fed. R. Crim. Pro. 32(i)(3)(B). Nevertheless, it went on to deny the objection for the following reasons.

The court concluded that it must follow First Circuit precedent concerning the meaning of "loss" under Guideline §2B1.1. There are several recent First Circuit decisions applying the loss definition set forth in Application Note 3(E)(i). See, e.g., United States v. Reda, 787 F.3d 625, 632, n.6 (1st Cir. 2015); United States v. Garcia-Pastrana, 584 F.3d 351, 391 (1st Cir. 2009); United States v. Maisonet-Gonzalez, 785 F.3d 757, 762-63 (1st Cir. 2015). A district court is bound by the "law of the circuit doctrine" to follow these precedents and apply Application Note 3(E)(i) unless one of the two exceptions to that doctrine applies. These exceptions arise when: (1) "an existing panel decision [is] undermined by controlling authority, subsequently announced," or (2) "authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind." United States v. Lewis, 963 F.3d 16, 23 (1st Cir. 2020).

Neither exception to the law of the circuit doctrine applied to this case. Neither Kisor nor any other subsequent controlling authority undermined Application Note 3(E)(i) or First Circuit precedent applying it. There is also no reason to believe that former panels of the First Circuit which applied the loss definition of Application Note 3(E)(i) would now change their minds in light of Kisor. In Lewis, the First Circuit concluded that

4

this exception to the law of the circuit doctrine did not apply because its earlier decisions interpreting Sentencing Guideline §4B1.2 did not employ a standard that was substantially more deferential than the one outlined in Kisor. See Lewis, 963 F.3d at 24. It noted that those panels did not "defe[r] to an application note that strayed beyond the zone of ambiguity in the Sentencing Guidelines" or "regar[d] [deference to the Sentencing Commission] as limiting the rigor of their analysis of whether the guideline was ambiguous," and that "those panels viewed their analyses as considering both the letter of the text and its purpose." See Lewis, 963 F.3d at 24. Brill did not argue that the First Circuit gave undue deference to Application Note 3(E)(i) when it applied that Commentary in Reda, Garcia-Pastrana, or Maisonet-Gonzalez, and there is no indication that it did.

Moreover, if the court were not bound by these precedents, it would still have concluded that it is proper to defer to the Sentencing Commission's definition of "loss" in Application Note 3(E)(i). Under Kisor, a court should presumptively defer to an agency's authoritative interpretation of its own regulation if: (1) the court determines the regulation is "genuinely ambiguous" after "carefully consider[ing] the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on;" and (2) the agency's reading is "within

the zone of ambiguity the court has identified after employing all its interpretive tools." See Kisor, 139 S. Ct. at 2415-16.

This court found that the term "loss" as used in §2B1.1 of the Guidelines is genuinely ambiguous. In Riccardi, the Sixth Circuit discussed three different dictionary definitions of "loss" and found that "the term 'loss' can mean different things in different contexts." See id. at 486. Although the history of §2B1.1 suggests that the Sentencing Commission intended that a "net" definition of loss, rather than a "gross" definition, should be applied, that history does not clarify how the net loss should be measured. See U.S.S.G. Amendment 617, effective November 1, 2001. The Guidelines do not make clear at what time the loss should be assessed, which could be when the loss is at its greatest amount, when defendant expected to be caught, or when defendant made complete restitution if able. It is also not clear whether the term "loss" should include lost interest and appreciation of assets or the expense to victims in recovering money.

Application Note 3(E)(i) to §2B1.1 resolves these ambiguities concerning the term "loss." It clarifies that the net loss is to be measured at the point before the offense is detected, and explains that the time of detection is the earlier of when the offense is actually discovered or the time the defendant knew or reasonably should have known that the offense was about to be discovered. U.S.S.G. §2B1.1, Application Note 3(E)(i). Brill did

6

not argue that this method of measuring net loss is unreasonable. The court concluded that the definition of loss in Application Note 3(E)(i) to §2B1.1 is reasonable and falls within the zone of ambiguity.

Applying Application Note 3(E)(i) to this case, Probation properly determined that the total loss amount should not be reduced by defendant's repayments to his victims. As indicated earlier, this Note provides that the total loss amount is reduced by:

> (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

See U.S.S.G. §2B1.1, Application Note 3(E)(i).

In <u>United States v. Mardirosian</u>, a case involving stolen paintings, the First Circuit wrote:

> Crediting Mardirosian with the return of the Cézanne would ignore the gravity of his crime. The Sentencing Guidelines treat loss as a proxy for the seriousness of the [defendant's] fraud. Mardirosian concealed the Cézanne for 20 years, and it was only after he realized that he could not sell the stolen painting without being caught that he reached out to [the owner] to negotiate over its return. Even then, he conditioned the Cézanne's return on the transfer of title to the six other paintings. Mardirosian is not entitled to a credit for this behavior that would place him on the same plane as a repentant thief who returned stolen

7

property before the owner even noticed its absence. United States v. Mardirosian, 602 F.3d 1, 13 (1st Cir. 2010) (internal marks omitted).

In this case, by January 5, 2018, the family members of one of the trust beneficiaries reported to a co-trustee that Brill was making transfers from the trust to an outside bank account. By February 15, 2018, he was aware that his victims had discovered or would very soon discover his crime. See Government's Sentencing Memorandum (Docket No. 32) at 3. In June 2018, Brill began negotiating with the trusts to calculate the total of amount of funds he had embezzled. See id. Brill did not make his first repayments to the trusts until July 2, 2018. See id. at 3-4. Therefore, defendant's repayments occurred after the time of detection and properly were not credited against the total loss amount pursuant to §2B1.1, Application Note 3(E)(i).

In view of the foregoing, as previously ordered on May 7, 2021, the court denied Brill's objection to the total loss amount of $589,896.34. He was ultimately sentenced to serve 24 months in custody and 36 months Supervised Release, and ordered to pay restitution in the amount of $381,662.81.

/s/ Mark L. Wolf
UNITED STATES DISTRICT JUDGE